ATTACHMENT K



Page 1

261 Fed.Appx. 110, 2008 WL 152604 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 261 Fed.Appx. 110, 2008 WL 152604 (C.A.10 (Kan.)))**

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Tenth Circuit Rule 32.1. (Find CTA10 Rule 32.1)

United States Court of Appeals,
Tenth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Montgomery Carl AKERS, Defendant-Appellant.

No. 06-3241.
Jan. 16, 2008.

**Background:** Defendant pled guilty in the United States District Court for the District of Kansas to one count of wire fraud for which he was sentenced to 327 months' imprisonment. Defendant appealed.

**Holding:** The Court of Appeals, Terrence L. O'Brien, Circuit Judge, held that defendant's criminal history category significantly under-represented his actual criminal history as to warrant an upward departure.

Affirmed.

West Headnotes

**Sentencing and Punishment 350H ⚖️841**

350H Sentencing and Punishment
　　350HIV Sentencing Guidelines
　　　　350HIV(F) Departures
　　　　　　350HIV(F)2 Upward Departures
　　　　　　　　350Hk841 k. Inadequacy of Criminal History Category. Most Cited Cases
Defendant's criminal history category significantly under-represented his actual criminal history as to warrant an upward departure sentence for conviction by guilty plea to wire fraud; defendant's fraudulent activity began at the age of 17 and became more serious despite convictions and sentences, and defendant's criminal conduct continued throughout and following guilt phase of instant prosecution. U.S.S.G. § 4A1.3, p.s. (2002).

**\*111** Kim I. Martin, Kansas City, KS, for Plaintiff-Appellee.

Roger L. Falk, Law Office of Roger L. Falk, Wichita, KS, for Defendant-Appellant.

Before KELLY, MURPHY, and O'BRIEN, Circuit Judges.

**ORDER AND JUDGMENT**[FN*]

[FN*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R.App. P. 32.1 and 10th Cir. R. 32.1.

TERRENCE L. O'BRIEN, Circuit Judge.
　**\*\*1** After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R.App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

　After pleading guilty to one count of wire fraud, Montgomery Carl Akers was sentenced to 327 months imprisonment, which constituted an upward departure from the recommended guideline range of 140 to 175 months imprisonment. He appeals from that sentence. We affirm.

**I. BACKGROUND**
A. *Fraudulent Scheme Involving Jenkins*
　While serving a 105-month sentence at the federal penitentiary in Leavenworth, Kansas, for four-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

261 Fed.Appx. 110, 2008 WL 152604 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 261 Fed.Appx. 110, 2008 WL 152604 (C.A.10 (Kan.)))**

teen counts of bank fraud, one count of making, uttering and possessing a counterfeit security, and one count of failure to appear, Akers placed an advertisement for a pen pal in a magazine. Anita Jenkins answered the ad and began corresponding with Akers in writing and on the telephone. Akers convinced Jenkins he had been falsely accused, told her he had a trust fund account and asked her to help him re-start a business he had prior to his incarceration. Jenkins agreed to help him. Akers sent her a power of attorney and had her purchase computer software which would allow her to create checks. He also had her open accounts at Fidelity Brokerage Services (Fidelity) and First Union Bank.

After these accounts were opened, Akers directed Jenkins to create two checks in the amounts of $35,000 and $25,000 and deposit them into the Fidelity account. He provided her the routing and account numbers. She believed the money was coming from his trust fund account. Akers then directed Jenkins to wire $58,000 from the Fidelity account to the First Union Bank account. Jenkins later created a third check for $35,000 and deposited it into the Fidelity account. Jenkins also created checks or initiated wire transfers totaling $57,000 from the First Union Bank account to various individuals. Jenkins did not learn she was creating worthless checks and engaging in fraudulent activity until she was contacted by law enforcement officers. As a result of the above scheme, Fidelity and Bank of America (which negotiates Fidelity's financial transactions) suffered actual losses of $22,236.77 and $20,000, respectively. Akers was subsequently indicted with five counts of wire fraud.

**\*112** B. *Post-Indictment Conduct*

While the indictment was pending, Akers was housed at the Corrections Corporation of America (CCA) in Leavenworth, Kansas, where he met fellow inmate Donald Mixan. Akers told Mixan he was wealthy and showed him paperwork indicating he had an account containing over $7 million. Although he initially believed Akers, Mixan soon realized it was a scam. Nevertheless, Mixan agreed to help Akers because it was "[e]asy money." (R. Vol. IV at 150.) Once Mixan was released, Akers had him purchase check-writing software and apply for credit cards. Akers directed Mixan to use the credit cards for his living expenses; the cards' balances were paid from accounts which had no money in them.

**\*\*2** Akers instructed Mixan to send two checks totaling $150,000 to an attorney Akers wanted to retain. These checks were intercepted by law enforcement officers. Because the attorney never received the checks, Mixan personally delivered a third check for $100,000 to him. Two more checks, in the amounts of $25,000 and $2,700, were sent to Akers's alleged wife and Mixan's landlord, respectively. All five checks were drawn on a U.S. Bank account that Mixan opened for Akers over the Internet with a $400 counterfeit check. Mixan also created a check for $2,500 using an account number he found in a dumpster. This check was deposited, at Akers's direction, into one of Akers's bank accounts. Akers further directed Mixan to create a $117,000 check and deposit it into another one of Akers's bank accounts. Fortunately, the banks involved in this scheme were able to avoid incurring financial loss by freezing the accounts or intercepting, dishonoring or returning the checks to the payee. However, the scheme did result in an actual loss of $2,037.21 to various businesses.

C. *Superseding Indictment and Plea*

The government filed a superseding indictment against Akers which, in addition to the five counts of wire fraud alleged in the original indictment, included a conspiracy to commit bank fraud count related to Akers's activities with Mixan, who was named as a co-defendant. Akers pled guilty to one count of wire fraud. Pursuant to the plea agreement, the government agreed to recommend Akers receive a two-level reduction for acceptance of responsibility and move for an additional one-level reduction at sentencing if he continued to accept responsibility and refrained from engaging in additional criminal conduct. While the parties also

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

261 Fed.Appx. 110, 2008 WL 152604 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 261 Fed.Appx. 110, 2008 WL 152604 (C.A.10 (Kan.)))**

agreed the amount of intended loss was not less than $242,000, Akers understood the government planned to provide evidence at sentencing showing his relevant conduct involved an intended loss of over $1 million.

A presentence investigation report (PSR) was prepared. Akers objected to the PSR's intended loss computation of $1,847,611.76 and its upward adjustment for his leader/organizer role in the offense. He also claimed he was entitled to a three-point downward adjustment for acceptance of responsibility.

D. *Post-Plea Conduct*

While Akers was awaiting sentencing, he initiated yet another fraudulent scheme. This time, he preyed on Tony Casanova, who suffers from multiple sclerosis. Akers and Casanova became pen pals through Casanova's church. Casanova opened a bank account for Akers and applied for a credit card for him. Akers also sent Casanova his telephone bills, promising to reimburse him. At Akers's direction, Casanova responded to a newspaper advertisement seeking investors for a casino boat. The person who placed the **\*113** advertisement referred Akers to Nick Voulgaris. Akers convinced Voulgaris he was wrongly convicted and was wealthy. Although the casino deal fell through, Akers succeeded in recruiting Voulgaris to help him start a business. At Akers's direction, Voulgaris created various checks totaling over $1 million and expended numerous hours on starting the business. Voulgaris also spent over $8,000 of his own money. In the end, Casanova's son contacted law enforcement personnel, who pulled the plug on Akers's scam.

**\*\*3** This did not stop Akers, however. He proceeded to dupe Cheryl Navarrette, a former cellmate's daughter. Based on Akers's promise of employment and financial security, Navarrette purchased check-writing software and her husband quit his job. Fortunately, Navarrette could not get the software to work and no fraudulent checks were produced. However, Navarrette and her family suffered financially.

E. *Sentencing*

After providing the parties notice of its intent to depart upward, the court held a two-day evidentiary hearing on Akers's objections to the PSR. At the hearing, Jenkins, Mixan and Voulgaris testified concerning their involvement with Akers. The government also played the prison-recorded telephone conversations between these individuals and Akers. After hearing these individuals' testimony, the court directed that the PSR be revised to include an upward adjustment based on the offense involving the exploitation of vulnerable victims.

The revised PSR calculated Akers's base offense level as 6 under USSG § 2F1.1(a).[FN1] Because the intended loss was more than $1.5 million but less than $2.5 million, the base offense level was increased by 12. *See* USSG § 2F1.1(b)(1)(M), (N). The PRS also applied (1) a 2-level enhancement because the offense involved a scheme to defraud more than one victim (USSG § 2F1.1(b)(2)(B)), (2) a 2-level enhancement because the offense involved the use of sophisticated means (USSG § 2F1.1(b)(5)(C)), (3) a 2-level upward adjustment because Akers exploited the vulnerability of his victims (USSG § 3A1.1(b)(1)) and (4) a 4-level upward adjustment based on Akers's leader/organizer role in the offense (USSG § 3B1.1(a)). It declined to provide Akers an adjustment for acceptance of responsibility due to his continued criminal conduct after his guilty plea. Based on these enhancements and adjustments, the total offense level was 28. The PSR assigned Akers 30 criminal history points for his prior convictions and the fact he committed the current offenses while serving another sentence, resulting in a Criminal History Category of VI. With a total offense level of 28 and a Criminal History Category of VI, the advisory guideline range was 140 to 175 months imprisonment. The PSR noted, however, that Akers's criminal history score was more than twice the number of points needed to place him in Criminal History Category VI (13 points) and that he had continued his criminal behavior even after its discovery by law enforcement officers. Based on these facts, the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**261 Fed.Appx. 110, 2008 WL 152604 (C.A.10 (Kan.))**
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 261 Fed.Appx. 110, 2008 WL 152604 (C.A.10 (Kan.)))**

PSR stated the court could conclude a sentence outside the guideline range was warranted.

> FN1. Akers was sentenced pursuant to the 1998 edition of the United States Sentencing Commission Guidelines Manual. All citations to the guidelines herein refer to the 1998 guidelines unless otherwise indicated.

At Akers's final sentencing hearing, the court overruled Akers's objections to the PSR and adopted the PSR's guideline calculations. It also found an upward departure ***114** was warranted under USSG § 4A1.3 because Akers's Criminal History Category of VI inadequately reflected the seriousness of his criminal history and the likelihood he would commit future crimes. It determined Akers had 17 more criminal history points than was necessary to place him in Criminal History Category VI and these additional points would hypothetically qualify him to move up an additional 6 criminal history categories were they available. Therefore, utilizing the procedure suggested in USSG § 4A1.3, the court determined it could approximate the same increase by moving up 6 offense levels to 34, which, with a Criminal History Category of VI, resulted in a guideline range of 262 to 327 months imprisonment. Believing that a sentence at the top of the range was appropriate, the court sentenced Akers to 327 months imprisonment.[FN2]

> FN2. "[A]ppalled[,] disappointed and outraged" with the Department of Justice's failure to prevent Akers from continuing his criminal conduct while incarcerated, the court recommended: (1) Akers be placed in segregated confinement, (2) he not be allowed to receive or send any mail except to his counsel of record, (3) all of his correspondence be scrutinized to ensure its legality and (4) he not have any telephone privileges. (R. Vol. III at 53.)

**II. DISCUSSION**

**\*\*4** Relying on *United States v. Cage,* 451 F.3d 585 (10th Cir.2006), and *United States v. Bishop,* 469 F.3d 896 (10th Cir.2006), *cert. denied,* --- U.S. ----, 127 S.Ct. 2973, 168 L.Ed.2d 706 (2007), Akers claims the court's upward departure, which constituted an 87% increase over the top of the recommended guideline range (175 months) and a 107% increase over the bottom of the recommended guideline range (140 months), was "extraordinary" and therefore was required to be supported by "extraordinary circumstances." (Appellant's Br. at 13 (quotations omitted).) Akers contends his criminal history is not extraordinary in light of the nature of his prior offenses. He asserts his sentence is unreasonable because the departure does not pass muster under the guidelines.

Aside from the fact *Cage* and *Bishop* are variance not departure cases,[FN3] they have been overruled by *Gall v. United States,* which specifically rejected "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range" or an appellate court's "use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." --- U.S. ----, 128 S.Ct. 586, 595, 169 L.Ed.2d 445 (2007). Rather, the *Gall* Court clarified that the reasonableness standard of appellate review it adopted in *United States v. Booker,* 543 U.S. 220, 260-62, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), is equivalent to the abuse of discretion standard and "courts of appeals must review all sentences-whether inside, just outside, or significantly outside the Guidelines range-under a deferential abuse-of-discretion standard." *Id.* at 591.

> FN3. A variance occurs "[w]hen a court enhances or detracts from the recommended range through application of § 3553(a) factors." *See United States v. Atencio,* 476 F.3d 1099, 1101 n. 1 (10th Cir.2007). This case involves a departure, which occurs "when a court reaches a sentence above or below the recommended Guidelines range

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

261 Fed.Appx. 110, 2008 WL 152604 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 261 Fed.Appx. 110, 2008 WL 152604 (C.A.10 (Kan.)))**

through application of Chapters Four or Five of the Sentencing Guidelines." *Id.*

Akers does not challenge the substantive reasonableness of his sentence. *See Gall,* --- U.S. at ----, 128 S.Ct. at 597. His only complaint is that the court erred in imposing an upward departure under USSG § 4A1.3.

**\*115** When reviewing departures, we consider four factors: "(1) whether the factual circumstances supporting a departure are permissible departure factors; (2) whether the departure factors relied upon by the district court remove the defendant from the applicable Guideline heartland thus warranting a departure; (3) whether the record sufficiently supports the factual basis underlying the departure; and (4) whether the degree of departure is reasonable." *United States v. Wolfe,* 435 F.3d 1289, 1295 (10th Cir.2006). Akers is essentially challenging the second factor. Specifically, he claims an upward departure was not warranted in this case because his prior offenses, although numerous, were not sufficiently serious in nature to remove him from the heartland of Criminal History Category VI.

Section 4A1.3 of the guidelines provides that an upward departure may be warranted upon a finding that the defendant's criminal history category significantly underrepresents the seriousness of his criminal history or the likelihood he will commit other crimes.[FN4] It further states:

> FN4. USSG § 4A1.3 states in relevant part:
>
> If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range. Such information may include, but is not limited to, information concerning:

> **(a)** prior sentence(s) not used in computing the criminal history category (e.g., sentences for foreign and tribal of- fenses);
>
> **(b)** prior sentence(s) of substantially more than one year imposed as a result of independent crimes committed on different occasions;
>
> **(c)** prior similar misconduct established by a civil adjudication or by a failure to comply with an administrative order;
>
> **(d)** whether the defendant was pending trial or sentencing on another charge at the time of the instant offense;
>
> **(e)** prior similar adult criminal conduct not resulting in a criminal conviction.

**\*\*5** The Commission contemplates that there may, on occasion, be a case of an egregious, serious criminal record in which even the guideline range for Criminal History Category VI is not adequate to reflect the seriousness of the defendant's criminal history. In such a case, a departure above the guideline range for a defendant with Criminal History Category VI may be warranted. In determining whether an upward departure from Criminal History Category VI is warranted, the court should consider that the nature of the prior offenses rather than simply their number is often more indicative of the seriousness of the defendant's criminal record.

In concluding an upward departure under USSG § 4A1.3 was appropriate in this case, the district court stated:

It's really extraordinary to see the same pattern of criminal behavior continue between the time of a guilty plea up until the very date of sentencing. And I agree with the government's observation that we have no reason to believe that the defendant will discontinue his behavior so long as he stays successfully able to manipulate people to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

261 Fed.Appx. 110, 2008 WL 152604 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 261 Fed.Appx. 110, 2008 WL 152604 (C.A.10 (Kan.)))**

doing what he want[s]. I don't think I've ever seen a more manipulative defendant, not only manipulative toward the Court, but towards other potential victims, even as the case is progressing....

Here ... the defendant's criminal history score's twice the number of points which is necessary to place him in Category [VI]....

I do believe that the defendant has an egregious criminal record and an egregious ***116** history of continued criminal conduct during the pendency of this case. I believe that a criminal history category of [VI] is [in]adequate to reflect the seriousness of his criminal history and the [likelihood] he will commit further criminal offenses no matter what the Court imposes....

   (R. Vol. III at 29-30, 33.)

The district court's departure analysis is in accordance with the guidelines departure analysis pre-*Booker,* -*Rita* and -*Gall.* We would easily affirm under that more rigorous test. But we are left with a much more deferential standard-abuse of discretion. The court did not abuse its discretion in determining Akers's extensive criminal history and the nature of his offenses warranted a significant upward departure from the guideline range.

As the PSR detailed, Akers has a long history of fraudulent activity, beginning at the age of 17 when he wrote an insufficient funds check for $50.00 while in the United States Marine Corp. From there, his fraudulent behavior only became more serious and sophisticated in nature. In 1977 and 1978, he was convicted of using forged and fraudulent checks to purchase vehicles. In 1983, he stole a truck which contained the owner's credit cards and identification. Akers then used the credit cards to purchase items totaling $3,000. Three years later and less than five months after being paroled, Akers was arrested and later convicted of using another individual's credit card to make a down payment on a motorcycle. A month after he was paroled on that conviction, he wrote three worthless checks. Several months later, he deposited worthless checks totaling $236,440.33 into his private account and then withdrew funds in excess of $76,000 from the account for personal use. He used the same scheme to obtain more than $70,000 from another bank. He also wrote two checks totaling $5,256.55 on a closed account as partial payment for a motorcycle. In 1995, Akers was charged in federal court with bank fraud and making, uttering and possessing a counterfeit security based on a scheme he facilitated through the successful manipulation of various acquaintances, including his girlfriend. He was sentenced to 105 months imprisonment, which was the sentence he was serving at the time he committed the current offenses and which itself was the result of an upward departure based on his extensive criminal record.[FN5] Not only is Akers's criminal history serious, it shows a clear pattern of recidivism. Indeed, Akers continued his fraudulent activities even after pleading guilty in this case.

> FN5. *See United States v. Akers,* 215 F.3d 1089, 1105-06 (10th Cir.2000) (affirming district court's imposition of an upward departure based on Akers's exceptional criminal history).

**\*\*6** Akers has no regard for the rights of others. In contrast, his sentence was considered and imposed in a manner that fully respected his rights. The sentence imposed was ultimately and exquisitely reasonable-just desserts for one who has dedicated his life to victimizing others.

   **AFFIRMED.**

C.A.10 (Kan.),2008.
U.S. v. Akers
261 Fed.Appx. 110, 2008 WL 152604 (C.A.10 (Kan.))

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.